Kenneth FOO, Plaintiff,

v.

The TRUSTEES OF INDIANA UNIVERSITY, a/k/a Indiana University; John Walda, In his representative and official capacities as President of the Trustees of Indiana University; Myles Brand, In his representative and official capacities as President of Indiana University; Richard McKaig, Individually and in his representative and official capacities as Dean of Students; Robert Allen Weith, Individually and in his representative capacities as Associate Director of Student Ethics and Resident Life; Lou Moir, In her representative and official capacities as Presiding Officer of the Review Board; Defendants.

No. IP 97–960–C–T/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.[1]

June 28, 1999.

---

1. The following caption is printed as it appears on the Plaintiff's Amended Complaint and Demand for Jury Trial ("Amended Complaint"). However, it is clear from the text of the Amended Complaint that the Plaintiff intends to make a claim against Wil McCall, in both his individual and official capacities, despite the fact that his name does not appear in the caption. As the Defendants make no objection to this omission, the court will assume that Mr. McCall was properly named as a Defendant in both his individual and official capacities.

Stephanie J. Hahn, Kendall Law Office, Indianapolis, IN, for plaintiff.

Cory Brundage, Ice, Miller, Donadio & Ryan, Indianapolis, IN, for defendant.

## ENTRY DISCUSSING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TINDER, District Judge.

This matter comes before the court on the Motion for Summary Judgment filed jointly by all the Defendants. Plaintiff, Kenneth Foo, claims that Defendant Indiana University ("I.U.") and the other Defendants, all of whom are affiliated with I.U., violated his constitutional rights in connection with his suspension and expulsion from I.U. Specifically, he claims the Defendants discriminated against him on the basis of his race and national origin in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. He also claims that the Defendants afforded him neither the substantive nor the procedural due process to which he was entitled under the Fourteenth Amendment and that the deprivation of these rights also violated § 1983. The Defendants move for summary judgment as to each of Mr. Foo's claims. The court, having considered the motion and submissions of the parties, finds as follows.

### I. Background Facts

Mr. Foo was a student at I.U. from 1990 until his expulsion in 1996. He is a male of Chinese descent and was born in the Republic of Singapore in 1967.

Mr. Foo's first disciplinary sanction at I.U. arose from an incident that occurred March 26, 1994. Catherine Spohnholtz, a staff member of Mr. Foo's residence hall, Foster Residence Center, filed a "Residence Hall Report Form" stating that Mr. Foo was in a hallway with an open container of beer. (Foo Dep. at 103–05; Foo Dep. Ex. 2.) The report further states that as Ms. Spohnholtz led Mr. Foo to the bathroom to dispose of the beer, Mr. Foo repeatedly tried to drink the remainder of the beer. (*Id.*) At an I.U. Judicial Conference on April 19, 1994, Mr. Foo was charged with violating the *Code of Student*

Ethics ("Code") and the *Handbook for Residence Hall Living* ("Handbook") during the March 26 incident. (Foo Dep. at 107–12; Foo Dep. Ex. 3.) On April 8, Mr. Foo received notice of the Conference and the charges against him. (*Id.*) At the Conference, Mr. Foo admitted he violated the Code and Handbook rule prohibiting the use or possession of alcoholic beverages in a residence hall. (Foo Dep. at 112.) In a letter dated April 22, 1994, the Foster Residence Center Judicial Board informed Mr. Foo that it had concluded that he had violated the rule as charged and informed him of his right to appeal the decision. (Foo Dep. Ex. 4.) The Board recommended to the Dean of Students, and the Dean accepted, that Mr. Foo complete an "Alcohol IQ" computer program as a sanction. (Foo Dep. at 112; Foo Dep. Ex. 1.) Mr. Foo completed the computer program. (*Id.*)

The next disciplinary proceedings I.U. instigated against Mr. Foo related to a November 29, 1994 incident that occurred in a residence hall cafeteria. Mr. Foo threw his food tray against a wall, breaking the dishes and glasses on the tray. (Foo Dep. at 79; Foo Dep. Ex. 5.) Mr. Foo told the cafeteria staff that he "just felt like destroying something." (*Id.*) A member of the cafeteria staff filed a Residence Hall Report Form about the incident. (*Id.*)

On December 1, 1994, Wil McCall, the Coordinator of Residence Life of Foster Residence Center, sent a letter to Mr. Foo stating that because of the incident in the cafeteria, he was being charged with violating certain provisions in the Code and Handbook. (Foo Dep. Ex. 6.)[2] At the scheduled Judicial Conference with Mr. McCall, Mr. Foo admitted that he had thrown the tray. (Foo Dep. at 119–20.) Mr. McCall subsequently recommended to the Dean of Students, and the Dean accepted, that Mr. Foo be placed on disci-

---

**2.** Mr. Foo testified that he could not remember receiving the letter, but he also testified that he remembered talking to Mr. McCall on the telephone about the charges and the scheduled Judicial Conference. (Foo Dep. at 116–17.)

plinary probation until April 1, 1995. (*Id.* at 121–22; Foo Dep. Ex. 7.) Mr. Foo was informed of the decision by a letter dated December 12, 1994. (*Id.*) The letter also stated: "If you are involved in any further acts of misconduct, or violate any conditions of the probation, additional charges and disciplinary sanctions, including suspension or expulsion from the University, may be imposed." (*Id.*) The letter further explained that the sanction would become binding unless Mr. Foo requested an appeal hearing. (*Id.*) Mr. Foo did not request a hearing. (Foo Dep. at 123.)

In the summer of 1995, Mr. McCall received a copy of a police report which indicated that Mr. Foo had been held on a 72–hour emergency detention at the Bloomington Hospital Crisis Care Unit in June. (McCall Aff. ¶¶ 9–10; McCall Aff. Ex. cc.) The report stated that the police had been requested to transport Mr. Foo to the Unit because Mr. Foo had made suicidal remarks to his mother and other people on campus. (*Id.*) Specifically, the report stated that Mr. Foo threatened to shoot himself in the head with a gun and also spoke of "getting some people in a car and then driving over a cliff." (*Id.*) The report stated that when the police came to Mr. Foo's room at Eigenmann Residence Hall, they found glass from broken bottles on his floor. (*Id.*) The report said that after bringing Mr. Foo to the Unit, they searched his car and dorm room pursuant to a search warrant and found three hundred rounds of firearm ammunition, information booklets on handguns, an order form for incendiary ammunition, and a completed order form for a "sniper training and employment manual." (*Id.*) The report also stated that the police recovered an Intratec 9mm Lugar Tec–DC9 (a semi-automatic handgun) with one clip, which Mr. Foo had stored in a safe deposit box at a local bank. (*Id.*)

Mr. McCall was told that Mr. Foo had left campus after his release from the Unit, but that he would be attending fall classes. (McCall Aff. ¶ 11.) Mr. McCall decided to charge Mr. Foo with violations of the Code and Handbook. (*Id.*) When Mr. Foo returned to campus in late August 1995, Mr. McCall repeatedly called Mr. Foo and Mr. Foo also called Mr. McCall.[3] (*Id.*; Foo Dep. at 270.)[4] On August 28,

---

**3.** The Defendants object, on hearsay and relevancy grounds, to Mr. Foo's testimony that Lieutenant Fincus, an I.U. police officer, told him to contact Mr. McCall. (Foo Dep. at 270.) If the statement were being offered for the truth of the matter asserted, it would be inadmissible hearsay. But the court finds that this statement is nonhearsay, offered to show its effect on the listener. *See, e.g., United States v. Hanson,* 994 F.2d 403, 406–07 (7th Cir.1993) ("An out of court statement that is offered to show its effect on the hearer's state of mind is not hearsay."). In Mr. Foo's deposition, the following exchange ensued:

Q: Why did you call [Mr. McCall]?
A: I was told to call Wil McCall.
Q: Who told you that?
A: Lieutenant Fincus.

(Foo Dep. at 265.)

However, the Defendants' relevancy objection is well-taken. The undisputed evidence is that Mr. McCall also tried to contact Mr. Foo (in addition to Mr. Foo trying to contact Mr. McCall) and that once they came into contact, Mr. McCall immediately arranged a meeting. (*Id.* at 279; McCall Aff. ¶ 11.) The fact that Mr. McCall may have initiated the call and the reason he did so is irrelevant to the issue of whether I.U. denied Mr. Foo due process. Therefore, the Defendants' objection is SUSTAINED.

**4.** Mr. Foo testified that while talking to Lieutenant Fincus about an unrelated matter, Lieutenant Fincus told him that unidentified people "in the administration" had said " 'Get him [Mr. Foo] out of here.' " (Foo Dep. at 267–69.) The Defendants object to the testimony on hearsay grounds and ask that it be stricken. Mr. Foo makes no showing that the out-of-court statement is nonhearsay or fits into a hearsay exception. The statement appears to offered for the truth of the matter asserted, rather than for its effect on Mr. Foo, especially in light of Mr. Foo's testimony insisting that he "didn't process" Lieutenant Fincus' statement as a warning or indication that anyone was going to make a charge against him. (*Id.* at 280–83.) The court finds that the statement is being offered for the truth of the matter asserted and agrees that above-quoted statement by Lieutenant Fincus constitutes inadmissible hearsay. The statement also is of questionable relevance since Mr. Foo never mentioned it at any disciplinary hearing or conference. (*Id.* at 269.) Therefore, the Defendants' objection is SUSTAINED.

1995, they came into contact. (McCall Aff. ¶ 11.) Mr. McCall told Mr. Foo about the charges and the need for a Conference. (*Id.*) Mr. Foo indicated that he would prefer to have the Conference quickly and it was scheduled for that afternoon. (*Id.*)

At the August 28 Judicial Conference, Mr. McCall gave Mr. Foo a form with three headings; the first heading said, "CODE OF STUDENT ETHICS," the next said, "Judicial Conference/Informal Disposition," and the last said, "Waiver of Right to Three–Day Notification." Mr. McCall told him: "You have to sign this so that we can have our talk today." (Foo Dep. at 284, 286.) Mr. McCall was "adamant" that they talk that day. (*Id.* at 288.) Mr. Foo signed the waiver form, which read:

> In order that my case be expedited, I hereby waive my right for a three-day notification of a judicial conference as provided for under section D, 3b, of the Student Code of Ethics. This waiver pertains to the conference on the charge(s) of: III B 20A(1) & (2) which allegedly occurred on June 12, 1995[at] Eigenmann Center.

(Foo Dep. Ex. 15.)

At the Conference, Mr. Foo received a copy of a letter dated August 21 from Mr. McCall. (McCall Aff. ¶ 12, Ex. dd.)[5] The letter explained that he was being charged with violating, among others, the Code provision prohibiting a student from making "an express or implied threat to interfere with an individual's personal safety" and the Handbook provision indicating that "activities that result in disturbance or distress to others ... are prohibited." (Foo Dep. Ex. 14.) The letter continued: "Specifically, it is being charged that on

June 12, 1995, at 7:00 p.m. at Eigenmann Residence Center, you made threats in reference to a handgun. Additionally you made threats of suicide." (*Id.*) The letter also stated that a Judicial Conference had been scheduled and, "[a]t the conference, a decision about responsibility may be determined and if appropriate, a sanction may be imposed." (*Id.*) At the Conference, Mr. McCall said to ignore the letter when Mr. Foo received it in his mailbox; he said it was moot because they had talked. (Foo Dep. at 264, 296–97.)

At the Conference, Mr. McCall asked Mr. Foo questions about the June 12 incident and showed him a copy of the police report. (McCall Aff. ¶¶ 13–14; Foo Dep. at 292–93, 298–99.) When asked about the allegations in the August 21 letter, Mr. Foo maintained that "nothing happened" and he "didn't do anything wrong." (Foo Dep. at 295, 299.) Mr. Foo also explained that he had been in the hospital and had switched doctors and there had been "issues" with his medication. (McCall Aff. ¶ 14; Foo Dep. at 298.) Mr. McCall told him that "even though nothing happened, we still need to make an arrangement." (Foo Dep. at 296.) He said, "You've got to go see a doctor; you've got to take your medicine; and you've got to come back to sign this contract...." (*Id.*) Because he did not feel like he had a choice, Mr. Foo said he would comply. (*Id.*)

Mr. Foo testified that the August 28 Judicial Conference was more informal than the earlier Judicial Conference that took place between Mr. McCall and Mr. Foo concerning the incident in the cafeteria. (*Id.* at 288–89.) Mr. Foo felt that the Conference was a "man-to-man thing."

---

5. At one point in his deposition, Mr. Foo testified that he "believed" he received the August 21 letter in early September. (Foo Dep. at 260.) At another point, he testified that he had also seen the August 21 letter at the August 28 Judicial Conference with Mr. McCall. (*Id.* at 299.) He also testified that was "not quite sure" when he received the August 21 letter and how many copies of the letter he received: he thought it could have been at the Conference and/or in his mailbox

in September. (*Id.* at 296, 299–300.) On the other hand, Mr. McCall testified unequivocally that he gave Mr. Foo the letter and produced a receipt signed by Mr. Foo acknowledging that he received the letter on August 28. (McCall Aff. ¶ 12, Ex. dd.) Based upon the receipt and Mr. McCall's testimony, Mr. Foo's equivocal testimony does not create a genuine issue of fact as to when he received the letter.

(*Id.* at 303.) He said: "As far as I'm concerned, that day I don't know what he was up to. He was talking to me, like shooting the breeze and being very casual about it and being—trying to be a friend or something. But he didn't seem to be charging me with anything." (*Id.* at 294.) On the other hand, Mr. McCall testified that he told Mr. Foo that he was found responsible for the charge and was going to be placed on disciplinary probation and would be required to enter into a "behavioral agreement." (McCall Aff. ¶ 14.)

Mr. McCall testified that on August 31, 1995, he gave Mr. Foo a letter confirming the contents of the August 28 Judicial Conference and stating that the Dean of Students had accepted Mr. McCall's recommendation that Mr. Foo be placed on disciplinary probation. (McCall Aff. ¶ 15; Foo Dep. Ex. 16.) The letter stated that the conditions of Mr. Foo's probation were that he stay on his regular prescription medication, meet weekly/biweekly with his mental health doctor, and meet with Mr. McCall at least monthly to discuss Mr. Foo's behavioral and academic progress. (Foo Dep. Ex. 16.) The letter continued:

> The above conditions will be more clearly spelled out in a contract between us to be developed by September 15, 1995.
>
> If you are involved in any further acts of misconduct, or violate any conditions of the probation, additional charges and disciplinary sanctions, including suspension or expulsion from the University, may be imposed.
>
> This sanction is considered binding unless you complete the "Request for University Hearing Commission" form enclosed. Such a request must be submitted ... no later than Friday, September 8, 1995.

(*Id.*) Mr. Foo testified that he could not remember receiving the letter until November of 1995, although he could not "with absolute certainty" deny Mr. McCall's testimony that Mr. McCall hand-delivered the letter to him in August. (Foo Dep. at 303–04, 317.)

On September 13, 1995, Mr. Foo again met with Mr. McCall. (*Id.* at 310–11; McCall Aff. ¶ 16.) At that meeting, Mr. Foo read and signed a memorandum which constituted the "behavioral contract." (Foo Dep. at 306, 310–11; McCall Aff. ¶ 16.) The memorandum read:

> As a follow-up to our Judicial Conference of August 28, 1995, we need to finalize the behavioral contract stipulated in the notification letter.
>
> In brief, you are required to stay on your regular, prescription medication, to meet weekly/bi-weekly with your mental health doctor, and to meet with me at least monthly for regular contact regarding your behavior on the floor and progress toward your degree.... By signing at the bottom, you acknowledge and agree to those conditions.
>
> First, I will need to have, by the first of every month, a memo from your mental health doctor that you have met with him regularly during the preceding 30-day period.
>
> Second, I will need to see, by the first of the month, evidence that you are purchasing and using your prescription medication....
>
> Third, we will need to meet on a formal basis by the 5th of every month to keep in touch regarding your progress toward your degree and behavior in the quad and on the floor.... I will contact you periodically throughout the month ... for more informal updates.

(Foo Dep. Ex. 18.) Mr. McCall told Mr. Foo that the contract would go into effect in October and the first deadline would be in November. (Foo Dep. at 322–23.) Mr. Foo testified that "my understanding was this [behavioral contract] was not supposed to go beyond him; it would stop at him." (*Id.* at 306–07.) At the time, he thought if he failed to meet the conditions of the contract, "there would be no consequences." (*Id.* at 307.)

On September 24, 1995, at 4:15 a.m., Mr. Foo walked onto a women's floor of a residence hall, while intoxicated, and loud-

ly sang the song "Ballad of the Green Beret." (Foo Dep. at 451–52, 461–62; Foo Dep. Ex. 23.) Mr. Foo's singing woke the Resident Assistant on the floor, and when she went into the hallway, two other residents were running towards her room to report the disturbance. (Foo Dep. Ex. 23.) The Resident Assistant told Mr. Foo that he needed an escort on the women's floor but he ignored her and refused to provide her any information. (*Id.*) On September 28, 1995, the same Resident Assistant saw Mr. Foo in the cafeteria and approached him. (Foo Dep. Ex. 24.) Mr. Foo told her that he "was not cooperating." (Foo Dep. at 453.) When she asked Mr. Foo what his name was, he replied, "Satan." (*Id.;* Foo Dep. Ex. 24.) The Resident Assistant completed Residence Hall Report Forms on both incidents.

On October 10, 1995, Mr. McCall and Mr. Foo saw each other in a residence hall cafeteria. (Foo Dep. at 318–21, 459–60.) Mr. McCall asked if Mr. Foo was going to stop by and talk about the behavioral contract and Mr. Foo responded that he was too busy. (*Id.*) Mr. Foo also indicated that he was too busy to see his doctor or get medication. (*Id.* at 318–21.) He explained that he was studying for midterm exams and it takes him two weeks to make an appointment with the doctor. (*Id.*) Mr. McCall said that "it would be better if [Mr. Foo] showed up [to meet with Mr. McCall about the contract] by the end of the week." (*Id.* at 319–22.) [6]

On October 16, 1995, after Mr. Foo failed to contact Mr. McCall about scheduling an appointment, Mr. McCall filled out a Residence Hall Report Form alleging that Mr. Foo failed to comply with the terms of the behavioral contract. (McCall Aff. ¶ 21; Foo Dep. Ex. 19.)

At this point, I.U. simultaneously pursued two sets of disciplinary proceedings against Mr. Foo, one addressing the singing incident on the women's floor and the other addressing Mr. Foo's alleged failure to comply with the behavioral contract.

On October 17, 1995, Mr. McCall sent Mr. Foo a charge letter notifying him that Mr. McCall had received the reports about the singing incident on the women's floor and I.U. was charging him with violating the Code and Handbook. (Foo Dep. 460; Foo Dep. Ex. 25.) The letter said he was charged with "failure to comply with the direction of authorized University officials in the performance of their duties, including failure to identify oneself when requested to do so", and the rules prohibiting "students [from] entering a hall of the living unit they do not live in without an escort who is a resident of that hall or living unit" and "activities that result in disturbance to others." (Foo Dep. Ex. 25.) The letter also stated that a Judicial Conference had been scheduled in connection with the charge for October 23, 1995. (*Id.*)

On October 19, 1995, Robert Weith, Associate Director of Student Ethics and Anti–Harassment Programs, sent Mr. Foo a charge letter concerning Mr. Foo's alleged failure to comply with the behavioral contract. (Weith Aff. ¶¶ 2, 8; Foo Dep. Ex. 20.) Mr. Weith had been designated by the Dean of Students' office to handle the matter. (Weith Aff. ¶ 8.) The letter charged Mr. Foo with violating the portion of the Code which requires a student to "comply with the direction of authorized University officials in the performance of their duties, including ... failure to comply with the terms of a disciplinary sanction." (Foo Dep. Ex. 20.) Specifically, the letter charged Mr. Foo with failing to comply with the terms of the behavioral agreement with Mr. McCall. (*Id.*) The letter stated that "[a]t the Conference, a decision about responsibility may be determined and, if appropriate, a sanction may be imposed." (*Id.*)

At the October 23 Judicial Conference between Mr. Foo and Mr. McCall (concerning the incident on the women's floor), Mr. Foo admitted that he was intoxicated and was singing in the women's hallway.

---

**6.** Mr. McCall reports a different version of this conversation, *see* McCall Aff. ¶ 21, but at the summary judgment stage, the court accepts Mr. Foo's version.

(Foo Dep. at 460–61; McCall Aff. ¶ 18.) Mr. Foo said he did not try to scare the Resident Assistant, but he was uncooperative. (McCall Aff. ¶ 18, Ex. ee.) He also said that: he would not go back to his doctor; he had thrown away his medication; and, he did not intend to take his medication or see his doctor again. (*Id.*) He spoke at length about "those who would try to judge him," questioning "by what right or standard" they could do so. (*Id.*)

On October 24, 1995, Mr. McCall gave Mr. Foo a letter confirming the October 23 Judicial Conference. (McCall Aff. ¶ 20; Foo Dep. Ex. 26.) The letter stated that Mr. McCall had decided Mr. Foo was responsible for "creating a disturbance on a women's floor where [he was] unescorted and for refusing to provide information or cooperate when asked by staff." (McCall Aff. ¶ 20; Foo Dep. Ex. 26.) The letter informed Mr. Foo that Mr. McCall recommended to the Dean of Students, and the Dean accepted, that Mr. Foo be suspended from I.U. until December 1996. (McCall Aff. ¶ 20; Foo Dep. Ex. 26.) The letter stated that the sanction was binding unless Mr. Foo completed and submitted, no later than November 3, 1995, the "Request for University Hearing Commission" form enclosed with the letter. (McCall Aff. ¶ 20; Foo Dep. Ex. 26.) On the same day he received the letter, October 24, Mr. Foo completed and submitted the Request for University Hearing Commission form and also waived in writing his right to a 10–day notification of the Hearing Commission Conference. (Foo Dep. Exs. 27, 28.)

On October 27, 1995, Mr. Weith, who had again been designated by the Dean of Students' office to handle further proceedings, sent Mr. Foo a letter concerning Mr. Foo's request for a Hearing Commission Conference about the incident on the women's floor. (Weith Aff. ¶¶ 2, 5; Foo Dep. at 468–69; Foo Dep. Ex. 29.) The letter restated the charges against Mr. Foo and stated that "the case will be reviewed in its entirety" at a Hearing that had been scheduled for November 6, 1995. (Foo Dep. Ex. 29.) The letter informed Mr.

Foo of his right to be represented by counsel, his right to call witnesses and cross-examine those who appear, and that a choice to remain silent would not be taken as an admission of responsibility. (*Id.*) The letter also listed the witnesses I.U. could present at the Conference. (*Id.*)

On October 30, 1995, a Judicial Conference occurred in connection with the allegation that Mr. Foo failed to comply with the terms of the behavioral agreement. (Weith Aff. ¶ 9.) Mr. Weith, Mr. Foo, Mr. McCall, and Frank Bantha (from the Student Advocates Office, present at Mr. Foo's request) were present. (Foo Dep. at 446–47.) Mr. McCall was questioned and Mr. Foo was given an opportunity to respond. (Weith Aff. ¶ 10.) At the conclusion of the Conference, Mr. Weith told Mr. Foo that he had found him responsible for the charges and that he would talk to the Dean of Students, Richard McKaig, before issuing a sanction. (*Id.*)

In early November 1995, Mr. Foo, his parents, and a "close friend" of Mr. Foo met with Dean McKaig and three other I.U. officials (including Mr. McCall) concerning Mr. Foo's sanction. At this time, Mr. Foo first remembers receiving the letter dated August 30, 1995, addressing Mr. McCall's findings at the August 28 Judicial Conference. (Foo Dep. at 303–04.)

On November 21, 1995, Mr. Weith sent Mr. Foo a letter confirming the October 30 Judicial Conference and restating his finding that Mr. Foo was responsible for failing to meet with the directions of the behavioral contract. (Weith Aff. ¶ 11; Foo Dep. Ex. 39.) The letter stated that the Dean of Students had accepted Mr. Weith's recommendation that Mr. Foo be expelled from I.U. effective immediately. (Foo Dep. Ex. 39.) The letter also informed Mr. Foo that the sanction would be binding unless he completed and submitted the enclosed "Request for University Hearing Commission" form. (*Id.*) Mr. Foo

completed and submitted the form. (Foo.Dep.Ex. 40.)

The Hearing Commission Conference concerning the incident on the women's floor, which had originally been scheduled for November 6, 1995, ultimately took place on December 8, 1995. (Weith Aff. ¶ 6.) The Commission consisted of two professors and one student, none of whom knew anything about what had transpired at the prior Judicial Conference, nor what sanction had been imposed. (*Id.*; Foo Dep. Ex. 32.) The Dean of Students was represented by Mr. Weith, and Mr. Foo was represented by an attorney. (Weith Aff. ¶ 6.) Each side had the opportunity to present witnesses and make closing statements. (Foo Dep. Ex. 32.) After deliberation, the Commission unanimously concluded that Mr. Foo was responsible for the charged conduct and decided to impose a sanction of suspension from I.U. effective immediately. (*Id.*) In addition to being informed of the Commission's decision, Mr. Foo was informed of his right to appeal the Commission's decision to the Review Board, a right which he exercised. (Foo Dep. Exs. 33, 34.)

In April 1996, the Review Board reviewed the record of the December 8 Hearing Commission Conference (concerning the incident on the women's floor) as well as the briefs submitted by Mr. Foo's attorney and Mr. Weith. (Weith Aff. ¶ 7; Weith Aff. No. 2, Ex. A; Foo Dep. Exs. 35, 36, 37.) On April 25, 1996, the Review Board notified Mr. Foo that it had affirmed the Hearing Commission's decision. (Weith Aff. ¶ 7; Weith Aff. No. 2, Ex. B; Foo Dep. Ex. 37.) The Review Board is the final step in I.U.'s judicial process. (Foo Dep. Ex. 37.)

On April 9 and April 30, 1996, a Hearing Commission Conference occurred concerning Mr. Foo's alleged failure to comply with the behavioral contract. (Weith Aff. ¶ 13; Weith Aff. No. 2, Ex. C.) The Commission was comprised of different individuals than those who made up the earlier Commission (concerning the incident on the women's floor). (Weith Aff. ¶ 13;

Weith Aff. No. 2, Ex. C.) After hearing evidence and argument from Mr. Weith and Mr. Foo's attorney, the Commission unanimously found Mr. Foo responsible for failing to comply with the express conditions, as well as the spirit, of the behavioral contract. (Weith Aff. No. 2, Ex. C.) The Commission found that the sanction should be expulsion, explaining:

> The Commission is deeply troubled by Mr. Foo's five separate violations of Indiana University's *Code of Student Ethics* and *The Handbook for Residence Hall Living.* Especially troubling are the two violations involving alcohol, the more recent of which occurred after Mr. Foo signed the behavioral contract with a residence hall coordinator. Also troubling was Mr. Foo's possession of a large supply of ammunition as detailed in the police reports submitted in regard to the June 12, 1995 incident. The Commission is in agreement that Mr. Foo represents a threat to himself and to the University community. Therefore, it voted unanimously in favor of expulsion from Indiana University.

(*Id.*)

On May 1, 1996, the Commission sent Mr. Foo a letter restating its conclusion that Mr. Foo was responsible for the charged conduct (failing to comply with the terms of the behavioral contract) and should be expelled as a sanction. (Foo Dep. Ex. 42.) The letter also informed Mr. Foo of his right to appeal to the Review Board, a right which he again exercised. (*Id.*; Foo Dep. Ex. 21.)

On August 8, 1996, the Review Board sent a letter to Mr. Foo informing him that after reviewing the Hearing Commission record and the additional submissions of the parties, it had affirmed the decision of responsibility for failing to comply with the behavioral contract and affirmed the sanction of expulsion. (Foo Dep. at 498; Foo Dep. Ex. 46.)

On June 12, 1997, Mr. Foo initiated this action, and on January 9, 1998, he filed his Amended Complaint. The Amended Complaint contains two Counts, each arising

under 42 U.S.C. § 1983 and alleging violations of the Fourteenth Amendment: (1) discrimination based on race and national origin, and, (2) deprivation of both procedural and substantive due process of law.

## II. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A "material fact" is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party. *See id.; Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994).

A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has supported the motion as provided by FED.R.CIV.P. 56(c), the party opposing the motion must come forward with evidence directed to specific facts showing that there is a genuine issue for trial. *See Duff v. Marathon Petroleum Co.*, 51 F.3d 741, 744 (7th Cir. 1995). When considering a motion for summary judgment, the court must view the facts, and all the inferences drawn from those facts, in the light most favorable to the nonmovant. *See Smith on Behalf of Smith v. Severn*, 129 F.3d 419, 426 (7th Cir.1997); *Frey v. Fraser Yachts*, 29 F.3d 1153, 1156 (7th Cir.1994).

## III. Discussion

### A. Procedural Due Process

Mr. Foo contends that he was deprived of procedural due process, particularly in the context of the August 28 Judicial Conference and the behavioral contract that resulted from that Conference.

#### 1. Legal Standards

 The Fourteenth Amendment to the United States Constitution provides that no state shall deprive any person of life, liberty, or property without due process of law. Due process is required when a decision of the state implicates an interest protected by the Fourteenth Amendment. A student's interest in pursuing an education, while not a fundamental right, *see San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), is included within the Fourteenth Amendment's protection of liberty and property. *See, e.g., Goss v. Lopez*, 419 U.S. 565, 574–75, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Dunn v. Fairfield Community High Sch. Dist. No. 225*, 158 F.3d 962, 964 (7th Cir.1998). Therefore, a student facing expulsion or suspension from a public educational institution is entitled to the protections of due process.[7] *See Goss*, 419 U.S. at 575–76, 95 S.Ct. 729.

 "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *see also Goss*, 419 U.S. at 577, 95 S.Ct. 729. In *Goss*, the Supreme Court addressed the issue of how much process is due public school students in the case of a suspension not exceeding ten days.[8] The

7. In *Osteen v. Henley*, 13 F.3d 221 (7th Cir. 1993), the court stated: "Although it is an open question in this circuit whether a college student as distinct from an elementary school or high school student has a property right in continued attendance, the defendants have not raised it, so we shall not attempt to answer it." *Id.* at 223 (citation omitted). As in *Osteen*, the Defendants in this case do not challenge Mr. Foo's contention that his suspension and expulsion deprived him of a constitutionally-protected property right, so the court will assume this to be the case.

8. There are differences between the procedure due for expulsion or suspension for academic reasons and that due when it is for disciplinary reasons. *See Board of Curators of*

Court first made the following admonitions:

> [T]he interpretation and application of the Due Process Clause are intensely practical matters and ... the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.... Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint.... By and large, public education in our Nation is committed to the control of state and local authorities.

*Id.* at 578, 95 S.Ct. 729 (quotations and citations omitted). Regarding a suspension of ten days or less, the Court held that due process requires that the student be given oral or written notice of the charges against him, an explanation of the basis for the accusation, and an opportunity to present his side of the story. *See id.* at 581, 95 S.Ct. 729; *see also Smith v. Severn,* 129 F.3d 419, 428 (7th Cir.1997). The Court continued:

> There need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is.

*Goss,* 419 U.S. at 582, 95 S.Ct. 729. As the Seventh Circuit summarized, "[t]he Court [in *Goss* ] characterized the procedures required by the fourteenth amendment as 'rudimentary,' amounting only to 'an informal give-and-take between student and disciplinarian.' " *Schaill by Kross v. Tippecanoe County Sch. Corp.,* 864 F.2d 1309, 1323 (7th Cir.1988) (quoting *Goss,* 419 at 584, 95 S.Ct. 729) (citing *Lamb v. Panhandle Community Unit Sch. Dist. No. 2,* 826 F.2d 526, 528 (7th Cir.1987) (due process satisfied where "principal and [student] informally discussed the incident shortly after it occurred")).

*Goss* left open the question of what due process requires in expulsion cases.[9] However, the Seventh Circuit has addressed the issue in three cases.[10] In *Linwood v. Board of Educ. of the City of Peoria,* 463 F.2d 763 (7th Cir.), *cert. denied,* 409 U.S. 1027, 93 S.Ct. 475, 34 L.Ed.2d 320 (1972), the Seventh Circuit stated that an expulsion hearing "need not take the form of a judicial or quasi-judicial trial." *Id.* at 770. The court held that due process in the context of an expulsion hearing "is not to be equated, as appellant urges, with that essential to a criminal trial or a juvenile court delinquency proceeding." *Id.* The court held that what is required under due process is an opportunity to be heard "at a meaningful time and in a meaningful manner." *Id.*

In *Betts v. Board of Educ. of the City of Chicago,* 466 F.2d 629 (7th Cir.1972), the Seventh Circuit held that on the question of what punishment is appropriate, the plaintiff was afforded due process when "she and her mother received adequate notice of the charges, had sufficient opportunity to prepare for the meeting, were accorded an orderly hearing and were given a fair and impartial decision." *Id.* at 633. In addition, the court stated that the failure of the school to specifically advise the plaintiff's mother about the possible consequences of the disciplinary hearing

---

the *Univ. of Missouri v. Horowitz,* 435 U.S. 78, 86, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). In the instant case, only the standard applied to disciplinary dismissals is relevant.

**9.** "We should also make it clear that we have addressed ourselves solely to the short suspension, not exceeding ten days. Longer suspensions or expulsion for the remainder of the school term, or permanently, may require

more formal procedures." *Goss,* 419 U.S. at 584, 95 S.Ct. 729.

**10.** Two of the three cases were decided in 1972, four years before *Goss.* However, this court finds that the two 1972 decisions are consistent with *Goss. See Baxter v. Round Lake Area Sch.,* 856 F.Supp. 438, 444 n. 11 (N.D.Ill.1994) (making the same finding).

was not a violation of plaintiff's due process rights. *See id.* at 633–34 (plaintiff received a sanction "tantamount to expulsion").

Finally, in *Osteen v. Henley,* 13 F.3d 221 (7th Cir.1993), the Seventh Circuit applied the procedural due process test established in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to the issue of whether a university student has a right to counsel in expulsion proceedings. The court stated that the *Mathews* test "requires consideration of the cost of the additional procedure sought, the risk of error if it is withheld, and the consequences of error to the person seeking the procedure." *Osteen,* 13 F.3d at 226. In holding that the Constitution did not confer a right to counsel on the expelled student, the court stated that "[t]he cost of judicializing disciplinary proceedings by recognizing a right to counsel is nontrivial, while the risk of an error—specifically the risk that Osteen was unjustly 'sentenced'—is rather trivial." *Id.* Earlier the court stated that "[t]he danger that without the procedural safeguards deemed appropriate in civil and criminal litigation public universities will engage in an orgy of expulsions is slight. The relation of students to universities is, after all, essentially that of customer to seller." *Id.*

### 2. Application

Mr. Foo's procedural due process claims center on the August 28, 1995 Judicial Conference and the behavioral contract that resulted from that Conference. Generally, Mr. Foo contends that "[g]enuine issues of material fact exist as to whether the Plaintiff received meaningful, adequate notice of the charges against him at a time when he could prevent a deprivation of his liberty and property interests." (Pl.'s Br. Resp. Defs.' Mot. Summ. J. at 20.) Specifically, he claims: he did not receive sufficient notice of the August 28 Judicial Conference; he did know he could appeal Mr. McCall's decision to impose the behavioral contract as a sanction; he had no notice of the potential consequences of failing to meet the terms of the contract; and, Mr. McCall misrepresented the effective date of the contract. He also contends that once Mr. McCall charged him with failure to comply with the behavioral contract, and Mr. Weith subsequently found him responsible for the charge, then "the Hearing Commission and the Review Board were ineffective to prevent the unjust consequence." (*Id.*) The effect of this final contention is to essentially negate all of the process I.U. afforded Mr. Foo, with the exception of the August 28, 1995 Judicial Conference (conducted by Mr. McCall and culminating in the behavioral contract) and the October 30, 1995 Judicial Conference (conducted by Mr. Weith, concerning the charge that Mr. Foo failed to comply with the behavioral contract). In passing, Mr. Foo also claims that he was denied procedural due process when he was suspended from I.U.

In reply, the Defendants contend that with respect to Mr. Foo's expulsion and suspension, as a matter of law, I.U. afforded Mr. Foo all the process he was due. The Defendants also contend that even if an I.U. official made errors during (or after) the August 28 Judicial Conference, those errors were cured by the subsequent process afforded Mr. Foo.

The court will address these claims in the order just summarized.

### a. The August 28 Judicial Conference and the "Behavioral Contract"

In considering whether Mr. Foo received adequate and meaningful notice of the August 28 Judicial Conference, the court must first decide what legal standard should be used to analyze the issue. The Defendants assert that the *Goss* standard (which applies to suspensions of ten days or less) should be used because the sanction resulting from the Conference, the behavioral contract, amounts to a sanction "less than" a ten-day suspension. *Goss* is the only case relied upon by Mr. Foo in his Response Brief, so it would seem that he agrees with the Defendants on this point. However, Mr. Foo later seems to imply (although it is never actually said) that the

imposition of the behavioral contract should be equated with expulsion. If this is Mr. Foo's argument, the court rejects it. Simply because Mr. Foo's alleged failure to comply with the terms of the contract exposed him to the sanction of expulsion does not mean that the initial imposition of the contract can also be equated with expulsion. For example, in *Lamb v. Panhandle Community School District No. 2*, 826 F.2d 526, 529 (7th Cir.1987), the court held that more formal procedures than announced in *Goss* (in *Lamb*, an informal discussion between student and principal shortly after the incident) were not required, despite the fact that the ten-day suspension arguably had the effect of an expulsion: the suspension occurred during final exams and prevented the high school senior from graduating. The court held that because it was possible for the senior to have had sufficiently high grades that he could have passed his classes without taking final exams (despite the fact that he did not in reality), the suspension did not amount to an expulsion. *See id.* Similarly, it was possible for Mr. Foo to have complied with the behavioral contract, and thus it cannot be said that the imposition of the contract amounted to an expulsion. Therefore the court finds the standard enunciated in *Goss* to be the most appropriate for analyzing whether the August 28 Judicial Conference comported with due process requirements. *Cf. Schaill by Kross v. Tippecanoe County Sch. Corp.*, 864 F.2d 1309, 1323 (7th Cir.1988) (sanction of denying eligibility to participate in athletic programs analyzed under *Goss* standard).

■ Mr. Foo contends that he was denied due process because he received no notice that the August 28 Conference was in fact a Judicial Conference and that he was being accused of a serious violation of the Code. However, the undisputed evidence refutes this factual contention. At the start of the Conference, Mr. Foo read and signed a form waiving his right to a three-day notification of the "judicial con-

ference." The form continued: "This waiver pertains to the Conference on the charge(s) of: III B 20A(1) & (2) which allegedly occurred on June 12, 1995[at] Eigenmann Center." (Foo Dep. Ex. 15.) Also during the August 28 Judicial Conference, Mr. McCall handed Mr. Foo a copy of the August 21 charge letter which states the specific charge ("[I]t is being charged that on June 12, 1995, at 7:00 p.m. at Eigenmann Residence Center, you made threats in reference to a handgun. Additionally, you made threats of suicide.") and the sections of the Code and the Handbook which he was alleged to have violated. (McCall Aff. ¶ 12, Ex. dd; Foo Dep. Ex. 14.) [11] And at the beginning of the Conference, Mr. McCall handed Mr. Foo a copy of the police report containing the evidence against Mr. Foo. (McCall Aff. ¶ 13, Ex. cc.) Finally, Mr. McCall verbally explained what Mr. Foo had been accused of doing, questioned Mr. Foo about those allegations, and allowed Mr. Foo an opportunity to respond to the allegations. (Foo Dep. at 293–95, 298–99.)

In spite of all of this undisputed evidence, Mr. Foo contends that he did not know that the August 28 Conference was a Judicial Conference and that Mr. McCall was charging him with anything. In support of his contention, he points to portions of his testimony indicating that Mr. McCall conducted the Conference in a more informal manner than the earlier Conferences in which Mr. Foo had participated, and that based upon Mr. McCall's "very casual" demeanor, Mr. McCall "didn't seem to be charging me with anything." (Foo Dep. at 294.)

Mr. Foo is, in essence, contending that his subjective understanding (or misunderstanding) that the August 28 Conference was not a Judicial Conference creates a genuine issue of fact. While the Seventh Circuit has not explicitly held that due process analysis involves a reasonable person standard rather than a subjective standard, an objective, reasonable person

11. See discussion of this evidence, *supra*, footnote 4.

standard is implicit in its holdings. For example, in *Smith on Behalf of Smith v. Severn,* 129 F.3d 419 (7th Cir.1997), the court explained why there was no genuine issue of fact as to whether the defendant principal informed the suspended student or his mother that his suspension was due to insubordinate conduct, despite the fact that the mother testified that the principal never told her or her son that her son was being suspended for insubordinate conduct:

> [E]ven if there is a dispute about whether Severn actually used the words 'insubordinate conduct' in her explanation of her decision to suspend Brandon, we believe that fact is not outcome-determinative, because the remaining evidence, which is undisputed, unquestionably demonstrates that the totality of Severn's actions amply communicated to Smith [Brandon's mother] that Brandon's suspension was based on insubordination.

*Id.* at 427.

Similarly, the dispute about whether Mr. McCall specifically told Mr. Foo that the August 28 meeting was a "Judicial Conference" and whether he specifically explained that he was charging Mr. Foo with a serious infraction is not outcome-determinative. The remaining undisputed evidence would clearly demonstrate to any reasonable person in Mr. Foo's position that the meeting was a Judicial Conference and he was being charged with a serious infraction. The charge letter alone (for which Mr. Foo signed a receipt) demonstrates these facts. The waiver of notification form (which Mr. Foo signed) also amply demonstrates the same facts. Mr. McCall also handed Mr. Foo a copy of the police report, containing the facts underlying the charge. Even Mr. Foo's version of the conversation (in which Mr. McCall quizzes Mr. Foo about threats involving handguns) should have alerted Mr. Foo to the contents of the charge. This conclusion is bolstered by the fact that the only time Mr. McCall had previously called Mr. Foo into his office (and presumably the only time they had previously conversed at

length) had been the Judicial Conference in which Mr. McCall found Mr. Foo responsible for violating the Code and Handbook in connection with the incident in the residence hall cafeteria. Furthermore, on two prior occasions, Mr. Foo had received disciplinary notices from an I.U. official (once from Mr. McCall) informing him that "further acts of misconduct" could lead to additional charges and sanctions, "including suspension or expulsion from the University." (Foo Dep. Exs. 4, 7.) Finally, Mr. Foo has not contended, nor is there any evidence in the record, that he was incapable of understanding the documents that he read and signed at the August 28 Conference. Perhaps more importantly, he has not demonstrated that any Defendant had any reason to suspect that he was incapable of such understanding. Indeed, at the time of the Conference, Mr. Foo was 28 years old, significantly older than a typical undergraduate. (Foo Dep. at 9.) In short, the court finds that the undisputed evidence demonstrates that any reasonable person in Mr. Foo's position would understand that the August 28 meeting was a Judicial Conference and he was being charged with a serious infraction. *Cf. Betts v. Board of Educ. of the City of Chicago,* 466 F.2d 629 (7th Cir.1972) ("Surely plaintiff and her mother realized from [a school official's] April 19th phone call, the episode at the police station, and the seriousness of the misconduct that some form of grave discipline would be invoked at the meeting.").

■ Mr. Foo also contends that he was denied due process because he did not receive advance notice of the August 28 Judicial Conference and the charges against him. While there is a dispute of fact about whether Mr. McCall informed Mr. Foo of the charges before the meeting, *compare* Foo Dep. at 279–80 *with* McCall Aff. ¶ 11, it is not outcome-determinative. Due process did not require Mr. McCall to give Mr. Foo advance notice of the purpose of the meeting. *See Goss,* 419 U.S. at 582, 95 S.Ct. 729 ("There need be no delay

between the time 'notice' is given and the time of the hearing."); *see also Smith on Behalf of Smith,* 129 F.3d at 428; *Lamb,* 826 F.2d at 528. The Code provides students with the right to three-day notification of Judicial Conferences, but the rights conferred by the Code are not relevant to federal due process analysis. *See Osteen v. Henley,* 13 F.3d 221, 225 (7th Cir.1993) ("As we tirelessly but unavailingly remind counsel in this court, a violation of state law (for purposes of this case the student judicial code may be treated as a state law) is not a denial of due process, even if the state law confers a procedural right. The standard of due process is federal.") (citations omitted); *Hill v. Trustees of Ind. Univ.,* 537 F.2d 248, 252 (7th Cir.1976) ("The fact that Professor Garnier did not comply with section 3.2(3) of the Student Code of Conduct when he gave plaintiff failing grades does not, in itself, constitute a violation of the Fourteenth Amendment."). Moreover, any right of advance notice that Mr. Foo had was waived when he read and signed the form entitled Waiver of Right to Three–Day Notification at the August 28 Conference. (Foo Dep. Ex. 15.)

█ Mr. Foo also claims that he was denied due process because he did not know that he could appeal Mr. McCall's decision to impose the behavioral contract as a sanction. There is an issue of fact as to when Mr. Foo received Mr. McCall's letter dated August 30, 1995, which explains that Mr. Foo had been found responsible for the charges, would be placed on disciplinary probation (the terms of which are in the behavioral contract), and had the right to request a Hearing Commission appeal. (Foo Dep. Ex. 16.) Mr. McCall testified that he gave it to Mr. Foo August 31, 1995, while Mr. Foo claims that, to the best of his recollection, he did not receive the letter until his meeting with Dean McKaig in early November 1995. (*Compare* McCall Aff. ¶ 15 *with* Foo Dep. at 303–04.) The August 30 letter says that the Hearing Commission request form must be submitted by September 8, 1995. (Foo Dep. Ex. 16.) Once again, this

dispute of fact is not outcome-determinative. If the August 28 Judicial Conference satisfied the requirements of due process, then due process would not require an appeal. *See Smith on Behalf of Smith,* 129 F.3d at 428–29 ("Due process does not require review by a school board. It only requires the initial pre-suspension notice, which we have already determined that Severn provided. The completely gratuitous review by the school board neither is required by due process nor gives rise to any due process rights."); *Winnick v. Manning,* 460 F.2d 545, 549 n. 5 (2nd Cir.1972) ("Winnick had no constitutional right to review or appeal after the disciplinary hearing which satisfied the essential requirements of due process.").

The issue then is whether the August 28 Conference satisfied the requirements of due process. As discussed above, Mr. McCall provided Mr. Foo with more than ample notice of the charges against him. By providing Mr. Foo with a copy of the police report, Mr. McCall showed him the evidence supporting the charges. Mr. McCall also questioned Mr. Foo about the incident and allowed Mr. Foo an opportunity to present his side of the story. According to the undisputed evidence, this Conference comported with the due process requirements set forth in *Goss. See Goss,* 419 U.S. at 581, 95 S.Ct. 729 ("[D]ue process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."); *see also Smith on Behalf of Smith,* 129 F.3d at 428 (restating and applying *Goss* standard); *Lamb,* 826 F.2d at 528 (informal discussion between student and principal satisfied due process). Having made this determination, the court finds that due process did not require I.U. to provide an opportunity for Mr. Foo to appeal the imposition of the behavioral agreement. Therefore, even if Mr. Foo did not receive the August 30 letter (which informed him of his right to

request an appeal) until after the deadline for appeal, this did not constitute a violation of Mr. Foo's due process rights.

■ Mr. Foo next contends that the Defendants denied him due process because he was not given notice of the potential consequences of failing to meet the terms of the behavioral contract. As in the contention that Mr. Foo was denied the right to appeal the August 28 Conference, this contention stems from the issue of fact as to when Mr. Foo received the August 30 letter from Mr. McCall. (*Compare* McCall Aff. ¶ 15 *with* Foo Dep. at 303–04.) This letter states that the terms of the behavioral contract constitute the terms of Mr. Foo's disciplinary probation. It also says that if Mr. Foo is "involved in any further acts of misconduct, or violate[s] any conditions of the probation, additional charges and disciplinary sanctions, including suspension or expulsion from the University, may be imposed." (Foo Dep. Ex. 16.) After a review of the pertinent caselaw, the court is unable to find a due process requirement that school officials inform students subject to sanction of the possible additional sanctions that could be imposed for failing to comply with the terms of the original sanction. In *Betts*, the Seventh Circuit held that the failure of the school to specifically advise the student and her mother about the possible sanctions that could be imposed at a disciplinary hearing did not violate the student's due process rights. The court held that based upon the totality of the circumstances the student and her mother "[s]urely" must have realized that "some form of grave discipline would be invoked at the meeting." *Betts*, 466 F.2d at 633–34; *see also Baxter v. Round Lake Area Sch.*, 856 F.Supp. 438, 444–45 (N.D.Ill. 1994) ("This court ... rejects plaintiff's argument that Paul was denied due process ... because the school did not inform plaintiffs of the possibility that Paul could be transferred to an alternate education program.") (citing *Betts* ); *cf. Smith on Behalf of Smith,* 129 F.3d at 427 (principal did not need to specifically tell student and his mother basis of suspension when it was apparent from the totality of the circumstances). If due process does not require the school official to tell the student the possible sanctions for the original wrongdoing, it seems logical that the official also would not be required to specifically inform the student of the possible sanctions for failing to follow the conditions of the original sanction.

This is especially true when the possible consequences of failing to follow the requirements of the behavioral contract were apparent from the totality of the circumstances. As discussed above, the totality of the circumstances surrounding the August 28 Conference clearly informed Mr. Foo that he was being charged with a serious offense. On two prior occasions, Mr. Foo had received disciplinary notices from an I.U. official informing him that "further acts of misconduct" could lead to additional charges and sanctions, "including suspension or expulsion from the University." (Foo Dep. Exs. 4, 7.) Further, the Code provides that "failure to comply with the direction of authorized university officials in the performance of their duties" and "failure to comply with the terms of a disciplinary sanction" are "acts of ... misconduct" that may result in discipline. (Freeman Aff., Ex. A at Part III, B, 7.) [12] The Code also provides that the sanctions imposed in any given case may be based upon "a student's prior record of misconduct, if any." (*Id.* at Part IV, Preamble.) And as indicated earlier, based upon the charge letter and the waiver of notification form, Mr. Foo was put on notice, as a matter of law, both that he was being charged with violating certain provisions of the Code and that the August 28 meeting was a Judicial Conference designed to adjudicate those charges.

---

**12.** Each student is given a copy of the Code when he or she is a Freshman at I.U. (Freeman Aff. ¶ 6.) Also, on at least two occasions prior to August 1995, Mr. Foo received a notice informing him of where he could obtain additional copies of the Code. (McCall Aff. ¶ 5, Ex. aa; Foo Dep. Exs. 3, 6.)

Mr. Foo relies heavily upon his belief that the behavioral agreement was a "man-to-man thing," which was an "understanding" that "was not supposed to go beyond [Mr. McCall]." (Foo Dep. at 303, 306–07.) However, he produces scant evidence to justify his subjective belief of the "man-to-man" nature of the behavioral contract. He testified that the August 28 Conference was more informal than the earlier Judicial Conference with Mr. McCall (concerning the incident in the cafeteria). (*Id.* at 288–89.) However, as set forth in *Goss,* the "rudimentary hearing" need not be formal. *See Goss,* 419 U.S. at 581–84, 95 S.Ct. 729 (due process requires at least an "informal give-and-take between student and disciplinarian"); *see also Linwood,* 463 F.2d at 770. There is a point at which the informality of school disciplinary procedures crosses the line drawn by due process, but Mr. Foo has not produced sufficient evidence to create an issue of fact as to whether that line was crossed in the August 28 Conference. *Cf. Osteen,* 13 F.3d at 226 ("We need not decide today at what point informality of disciplinary procedures crosses the line drawn by due process...."). The court finds, as a matter of law, that Mr. Foo was put on notice of the potential that serious consequences could result from failing to comply with the behavioral contract.

As discussed above, the Conference comported with the due process standards enunciated in *Goss* and subsequent Seventh Circuit caselaw dealing with school suspensions. The August 28 Conference also comported with the due process requirements when analyzed through the factors enunciated in *Mathews v. Eldridge.* In *Mathews,* the Supreme Court wrote that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." 424 U.S. at 333, 96 S.Ct. 893 (internal quotations omitted). The Court stated that the specific procedures appro-

priate in a particular situation should vary, depending on three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. 893; *see generally Duncan v. State of Wis. Dept. of Health and Family Servs.,* 166 F.3d 930, 936 (7th Cir.1999); *Osteen,* 13 F.3d at 226.

With respect to Mr. Foo's private interest, the burdens imposed by the terms of the behavioral contract appear to have been less than would have been imposed by even a short-term (i.e., ten days or less) suspension. Mr. Foo was required to meet with Mr. McCall at least once a month and provide documentation that he was seeing his mental health doctor and taking his prescription medication. The burden on Mr. Foo of complying with the contract would have been far from onerous and would not have interfered in any way with his classes and education.[13]

With respect to the second factor, in *Osteen,* the Seventh Circuit noted that "[t]he danger that without the procedural safeguards deemed appropriate in civil and criminal litigation public universities will engage in an orgy of expulsions is slight." *Osteen,* 13 F.3d at 226. The danger that, without additional procedural safeguards than those taken in the August 28 Conference, public universities will engage in an orgy of "behavioral contracts" is far more slight.

Considering the value of additional safeguards presents a problem. As discussed above, the totality of the circumstances clearly demonstrated that the August 28

---

13. Mr. Foo does not contend that the behavioral contract sought private or privileged in- formation that I.U. could not properly request or was burdensome for Mr. Foo to provide.

Judicial Conference concerned a serious matter. Mr. McCall handed Mr. Foo numerous documents, including the police report, and asked Mr. Foo to sign two of the documents. He questioned Mr. Foo about the events in the police report. The charge letter and waiver of notification form informed Mr. Foo that he was being charged with violations of the Code and Handbook and that his meeting with Mr. McCall was a Judicial Conference. There is no evidence in the record that Mr. Foo either could not understand those forms or that Mr. Foo gave some type of external sign that he was failing to comprehend the meaning of the forms.[14] The court could speculate that Mr. Foo may have understood better had Mr. McCall been more formal, or had verbally used the words, "you are being found responsible for a very serious violation and can be expelled if you fail to abide by the terms of the sanction, i.e., the behavioral contract." However, this would be pure speculation. It is possible that Mr. McCall may have had to shout this phrase ten times before Mr. Foo would believe it. This issue illustrates why the court relies upon a reasonable person standard.[15] Because it is entirely unclear what would have been necessary to alter Mr. Foo's subjective understanding, it is difficult to assess the probable value of additional safeguards.

The interests of I.U. involved the health and well-being of its students, including Mr. Foo. I.U. officials had ample evidence to believe that there existed a potential of harm to the student body from a student who made threats and suicidal remarks while being in possession, on campus property, of three hundred rounds of ammunition and an order form for "sniper train-ing," and, on off-campus property, of a semi-automatic handgun.

The court notes that the terms of the contract were tailored to Mr. Foo's situation; when asked about the incident in June (as outlined in the police report), Mr. Foo responded that he had switched doctors and had "issues" with his medication. (McCall Aff. ¶ 14.) In other words, the terms of the contract appeared to have been designed to eliminate what Mr. McCall reasonably deemed to be the cause of the incident in June. Therefore, it is difficult to say that a different type of sanction would have been better suited to Mr. Foo's situation. In sum, the court finds, as a matter of law, that I.U. provided Mr. Foo with appropriate procedures before imposing the behavioral contract as a sanction.

Mr. Foo does raise a meaningful issue of fact with regard to the effective date of the behavioral contract. Mr. Foo testified that on September 13, 1995 (the date Mr. Foo signed the behavioral contract), Mr. McCall told him that the contract "start[ed] with October" and "the first deadline is in November." (Foo Dep. at 324.) However, on October 16, 1995, Mr. McCall charged Mr. Foo with violating the terms of the behavioral agreement; he stated in the Residence Hall Report Form that the initial deadlines were October first and fourth. (Foo Dep. Ex. 19.) The actual behavioral contract contains no provision about its effective date. (Foo Dep. Ex. 18.) Assuming that Mr. McCall told Mr. Foo that the first deadline was in November, then presumably he made a misstatement in the Report From. However, Mr. McCall's statement that the first deadline was in November did not alone create any problem. Instead, the problem

---

**14.** Indeed, there is no evidence in the record that Mr. Foo raised these issues at *any* time during *any* of the three hearings that resulted from the charge that he failed to comply with the behavioral contract.

**15.** For example, despite having received multiple notices that further acts of misconduct could lead to additional sanctions, including expulsion, *see* Foo Dep. Exs. 4, 7; Freeman Aff., Ex. A at Parts III & IV, Mr. Foo testified that he believed that he could "run up as many violations as possible and not have harsher penalties." (Foo Dep. at 534.)

arose on October 16, when Mr. McCall completed the Report Form; in other words, Mr. McCall could not be accused of misrepresentation (or, more innocuously, poor memory) until he made a representation of the contract's initial deadline that contradicted his earlier one. Therefore, with respect to this issue of fact, the correct inquiry is not whether I.U. denied Mr. Foo procedural due process in connection with the *imposition* of the contract, but whether his rights were denied in connection with the October 16 charge that Mr. Foo violated the behavioral contract itself.

■ However, despite this issue of fact, the undisputed evidence demonstrates that I.U. provided Mr. Foo with sufficient due process in connection with the charge that he violated the behavioral contract. Mr. Weith sent Mr. Foo a charge letter stating that Mr. McCall filed a report indicating that Mr. Foo had violated the behavioral contract. The letter provided him with notice of the charges against him and the Judicial Conference scheduled to adjudicate those charges. (Foo Dep. Ex. 20.) At the October 30 Judicial Conference, Mr. McCall was questioned and Mr. Foo was given an opportunity to respond. (Weith Aff. ¶ 10.) A representative from the Student Advocates Office was present at Mr. Foo's request. (Foo Dep. at 446–47.) Mr. Foo, his parents, and a close friend met with Dean McKaig and other I.U. officials to discuss the situation. (*Id.* at 303–04.) Mr. Weith later notified Mr. Foo that Mr. Weith had recommended, and Dean McKaig had accepted, that Mr. Foo be expelled. (Foo Dep. Ex. 39.) Mr. Weith's letter also informed Mr. Foo of his right to appeal the decision. (*Id.*) Mr. Foo took advantage of that right, contending that the sanction was too severe. (Foo Dep. Ex. 40.) [16] The Hearing Commission reviewed Mr. Foo's case "in its entirety." (Foo Dep. Ex. 41.) The three-person Commission knew nothing about Mr. Foo's case before the hearing. (Weith Aff. ¶ 13.) Each side

had the opportunity to present witnesses (announced in advance of the hearing), cross-examine opposing witnesses, and make closing statements. (Foo Dep. Ex. 41; Weith Aff. No. 2, Ex. C.) Mr. Foo was represented by a private attorney. (*Id.*) After determining that Mr. Foo was responsible for the charged conduct, the Commission heard Mr. Foo's prior disciplinary record in order to determine an appropriate sanction. (*Id.*) The Commission then unanimously voted to expel Mr. Foo. (*Id.*) The Commission informed Mr. Foo of his right to have its decision reviewed by the Review Board, a right which Mr. Foo exercised. (Foo Dep. Exs. 21, 22.) The Review Board consisted of three individuals who had not previously been involved in Mr. Foo's case. (Foo Dep. Ex. 22.) It reviewed tapes of the Hearing Commission Conference, heard the argument of Mr. Foo's attorney, and affirmed the decision of responsibility and sanction imposed by the Hearing Commission. (Foo Dep. Ex. 22; Weith Aff. ¶ 15.)

In the face of this evidence, Mr. Foo does not contend that any procedural deficiencies existed in the notices or other procedures used in the October 30 Judicial Conference, the subsequent Hearing Commission Conference, or the subsequent Review Board hearing. He does not contest the Defendants' evidence that the Hearing Commission engaged in a *de novo* review. He produces no evidence showing that any of the decision makers at each level of review were biased against him. *Cf. Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) (indicating that there is "a presumption of honesty and integrity in those serving as adjudicators"). Instead, he contends that "[o]nce the technical violation of the Student Code relating to Foo's failure to abide by the Behavioral Contract was documented and given the appearance of official action, the Hearing Commission and the Review Board were ineffective to prevent the un-

---

16. In his November 1995 request for appeal, Mr. Foo did not deny the charge that he failed to comply with the behavioral contract and, more specifically, he did not contend that he believed the first deadline under the contract was in November.

just consequence." (Pl.'s Br. Resp. Defs.' Mot. Summ. J. at 20.) This may be true, but Mr. Foo provides no evidence to support the assertion. At the summary judgment stage, a party is required to do more than simply make allegations. "Roughly speaking, this is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Schacht v. Wisconsin Dept. of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999).

The Defendants have produced uncontroverted evidence that Mr. Foo had multiple opportunities to present his side of the story before neutral decision makers. Of course there is a risk that Mr. Weith, the Hearing Commission, and the Review Board all erred in believing Mr. McCall's statement that the first deadline under the behavioral contract was in October. This risk is inherent in any adjudicatory proceeding; the fact that the adjudicators may have erred in not believing the student's version of events does not alone amount to a due process violation. *See, e.g., Linwood*, 463 F.2d at 769 (student and teacher presented contradictory stories as to who instigated a fight); *Zehner v. Central Berkshire Reg'l Sch. Dist.*, 921 F.Supp. 850, 861 (D.Mass.1995) (holding that high school student who was suspended for skipping study hall was not denied due process despite contention that brief inquiry into his schedule would have shown that he was not scheduled for study hall and thus could not have skipped it; where student was given opportunity for rebuttal, court did not have to consider any factual

error which may have been made in exercise of school administrator's decision). The Supreme Court has indicated that court review of disciplinary decisions is limited:

> It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion. . . . [Public school students do not have] the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations. The system of public education that has evolved in this nation relies necessarily on the discretion and judgment of school administrators and school board members and § 1983 was not intended to be a vehicle for federal correction of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees.

*Wood v. Strickland*, 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (citations omitted). The fact that the various adjudicators may have erred in some portion [17] of their factual findings does not negate the extensive process I.U. afforded Mr. Foo.

In conclusion, the court finds that while Mr. Foo points to a few disputed issues of fact, he has not demonstrated that those issues are outcome-determinative. *See generally Smith on Behalf of Smith*, 129 F.3d at 427 ("[T]o preclude summary judgment, the non-moving party must show the disputed fact to be material, that is, it must be outcome-determinative under the applicable law. Thus, facts not outcome-

---

**17.** While there is an issue of fact as to when the first deadline occurred for Mr. Foo to meet with Mr. McCall, it is undisputed that Mr. Foo failed to comply with his other obligations under the behavioral contract. Mr. Foo was "required to stay on [his] regular, prescription medication, [and] to meet weekly/bi-weekly with [his] mental health doctor." (Foo Dep. Ex. 18.) However, he testified in his deposition that after signing the contract, he did not see his doctor and did not regularly take his medication. (Foo Dep. at 99, 320.) More importantly, it is undisputed that on

October 10 (after Mr. Foo believed his obligations under the behavioral contract had begun, *see id.* at 322–23), Mr. Foo told Mr. McCall that because of his busy class schedule he had neither seen his doctor nor bought his medication. (*Id.* at 318–19.) Therefore, it is undisputed that Mr. McCall had sufficient grounds to charge Mr. Foo with failing to comply with the contract. Furthermore, a few days after Mr. McCall issued the charge, Mr. Foo told Mr. McCall that he had thrown away his medication and did not intend to see his doctor again. (McCall Aff. ¶ 18, Ex. ee.)

determinative ..., though in dispute, may still permit the entry of summary judgment.") (quoting *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav.*, 806 F.2d 146, 149 (7th Cir.1986)). Therefore, the court finds that the Defendants are entitled to summary judgment as to Mr. Foo's claims that he was denied procedural due process when he was expelled from I.U.

### b. Suspension

In his Amended Complaint, Mr. Foo contends that the Defendants also denied him procedural due process when he was suspended from I.U. The Defendants moved for summary judgment on this claim, and Mr. Foo responded with a passing comment that genuine issues of fact exist as to whether he was denied procedural due process when he was suspended. (Pl.'s Br. Resp. Defs.' Mot. Summ. J. at 15.) His actual arguments in opposition to summary judgment address only issues related to the August 28 Judicial Conference, the subsequent behavioral contract, and the charge that he violated the contract. Mr. Foo's suspension arose from the charge concerning the singing incident on the women's floor. He has produced no evidence of any infirmities with respect to the process he received related to this charge and the resulting sanction of suspension. As detailed in the background facts set forth above, Mr. Foo received more than adequate notice and opportunities to present his evidence (and challenge the charging party's evidence) before neutral decision makers. Therefore, the court finds that the Defendants are entitled to summary judgment as to Mr. Foo's claims that he was denied procedural due process when he was suspended from I.U.

### c. Cure

██ I.U. presented Mr. Foo with multiple opportunities to raise his arguments concerning the alleged procedural deficiencies in the August 28 Judicial Conference and the resulting behavioral contract. This court has previously found that, even viewing the facts in the light most favorable to Mr. Foo, none of the "deficiencies"

amount to denials of due process. In the alternative, the court finds that even if one or more of the "deficiencies" crossed the line drawn by the Due Process Clause, the defect was rectified, or "cured," by the subsequent process afforded Mr. Foo.

In *Betts v. Board of Educ. of the City of Chicago*, 466 F.2d 629 (7th Cir.1972), the court recognized that even if the school's notice to the plaintiff and her mother was deficient, she was not denied due process because she had subsequent opportunities to present her arguments: "Since she was given a full chance to contest the transfer to Simeon on and after April 20th, we cannot say that Mr. Dravillas' April 19th failure specifically to advise Mrs. Betts of the possible transfer denied plaintiff due process." *Id.* at 633. Similarly, in *Lamb v. Panhandle Community Unit Sch. Dist. No. 2*, 826 F.2d 526, 528–29 (7th Cir.1987), the court held that due process required the school to give the suspended student an opportunity to "present a mitigative argument," a requirement that the school satisfied when it gave the plaintiff such an opportunity at a board hearing conducted two weeks *after* the suspension. *Cf. Heller v. Hodgin*, 928 F.Supp. 789, 795 (S.D.Ind. 1996) ("Plaintiff contends that the faculty members made their decision to suspend her before she was even told that obscenity was the grounds for the discipline. Even if this were true, the discipline did not take effect until the following school day. Plaintiff and her mother not only knew but had ample opportunity on the day of the cafeteria incident to argue against the suspension.... There is no evidence that had the daughter's and the mother's arguments been persuasive, Ms. Burden would not have changed her mind.").

Also, in other contexts, the Seventh Circuit has held that minor procedural errors may be cured by a subsequent hearing. *See Shidaker v. Carlin*, 782 F.2d 746, 752 (7th Cir.1986) ("[T]he minor procedural error of Santoro's ex parte communication was mitigated by Shidaker's knowledge of it, and chance to respond to it, in the full

*de novo* hearing at which Koenig's decision was reviewed."), *judgment vacated on other grounds, Tisch v. Shidaker,* 481 U.S. 1001, 107 S.Ct. 1621, 95 L.Ed.2d 195 (1987); *Burbank v. Twomey,* 520 F.2d 744, 750 (7th Cir.1975) ("[A]lthough Burbank did not receive adequate advance notice of the time of the Merit Staff hearing, this defect was cured by the holding of a second hearing."); *cf. Henry v. INS,* 8 F.3d 426, 440 (7th Cir.1993) ("Even if we were to assume that counsel was ineffective ..., and that counsel's ineffectiveness resulted in a denial of due process, we believe that in these circumstances the Board may cure any 'fundamental unfairness' if it carefully considers the supplemental evidence that accompanies the second motion to reopen.").

Courts in other circuits have also held that "[i]t is ... well settled that a procedural defect in an initial hearing before school officials can be cured by subsequent hearings." *Sullivan v. Houston Indep. Sch. Dist.,* 475 F.2d 1071, 1077 (5th Cir. 1973); *see also Brewer v. Austin Indep. Sch. Dist.,* 779 F.2d 260, 263 (5th Cir.1985) ("[S]chools may wish to provide appellate mechanisms to cure procedural errors that can creep into initial suspension proceedings...."); *Winnick v. Manning,* 460 F.2d 545, 549 (2nd Cir.1972) ("[A]ny procedural irregularities in the preliminary suspension hearing were cured by the full disciplinary hearing on June 2, which in effect was a trial *de novo.*"); *see also Murray v. West Baton Rouge Parish Sch. Bd.,* 472 F.2d 438, 443 (5th Cir.1973); *Greene v. Moore,* 373 F.Supp. 1194, 1198 (N.D.Tex.1974); *Bistrick v. University of South Carolina,* 324 F.Supp. 942, 952 (D.S.C.1971); *Speake v. Grantham,* 317 F.Supp. 1253 (S.D.Miss.1970), *aff'd,* 440 F.2d 1351 (5th Cir.1971); *Zanders v. Louisiana State Bd. of Educ.,* 281 F.Supp. 747, 767–68 (W.D.La.1968).

There are two important characteristics of the process provided by I.U. after the August 28 Judicial Conference. First of all, at least with respect to the October 30 Judicial Conference and the Hearing Commission Conference in April (both concerning the charge that Mr. Foo failed to comply with the terms of the behavioral agreement and culminating in the sanction of expulsion), Mr. Foo was allowed to produce evidence and have his case viewed *de novo.* Second, Mr. Foo has not alleged (much less shown) that he was deprived of any property or liberty interest by the implementation of the behavioral contract alone; instead the deprivation occurred with his expulsion (which resulted from the charge that he violated the contract). Therefore, *prior* to any deprivation resulting from the charge,[18] Mr. Foo was pro-

---

18. Mr. Foo had been suspended by I.U. six days prior to his October 30 Judicial Conference concerning the charge that he had violated the behavioral contract. However, it is unclear whether this suspension had actually become effective. (*Compare* Foo Dep. Ex. 26 (October 24 letter stating that the suspension was "effective immediately") *with* Foo Dep. Ex. 29 (October 27 letter stating that the "proposed" sanction of suspension could be imposed if Mr. Foo fails to appear for the upcoming Hearing Commission Conference).) Even if the suspension had become effective, it resulted from the incident on the women's floor, a matter unrelated to the behavioral contract, and thus there had been no deprivation stemming from the August 28 Conference or the charge of violating behavioral contract.

With respect to the Hearing Commission Conference in April (concerning the charge of violating the behavioral contract), Mr. Foo was presumably serving his suspension (which was scheduled to continue until December 1996), so he had yet to be deprived of any property or liberty interest as a result of the charge of violating the behavioral contract.

It is conceivable that there may have been some time between November 21 (when he was notified of the sanction of expulsion) and April, in which Mr. Foo was deprived of the opportunity to be at I.U. because of the expulsion and not because of the suspension. In order for this to be the case, the court would need to infer that I.U. did not begin enforcing Mr. Foo's suspension until after the December 8 Hearing Commission Conference concerning the incident of the women's floor, and began enforcing the expulsion immediately after the November 21 letter informing Mr. Foo of Mr. Weith's and Dean McKaig's decision. However, in order for the court to make this inference, it would need to infer that I.U. followed different procedures with

vided with notice and opportunity to be heard concerning his arguments about deficiencies related to the August 28 Conference and the implementation of the behavioral contract. In *Goss*, the Court held that the state's general administrative review statute could not save the school's inadequate procedures for two reasons: (1) review would not be *de novo*, and (2) the suspension would not be delayed pending the appeal, and "the student meanwhile will irreparably lose his educational benefits." *Goss*, 419 U.S. at 581 n. 10, 95 S.Ct. 729. Neither of these concerns are present with respect to the October 30 Judicial Conference and the April Hearing Commission Conference.[19]

In conclusion, the court finds that even if the process afforded Mr. Foo was inadequate when the behavioral contract was adopted or when Mr. McCall charged Mr. Foo with failing to comply with the contract, any defects were cured by the subsequent (predeprivation and *de novo* ) process afforded Mr. Foo.

### B. Substantive Due Process

In recent years, both the Supreme Court and the Seventh Circuit have "emphasized ... how limited the scope of the substantive due process doctrine is." *Dunn v. Fairfield Community High Sch. Dist. No. 225*, 158 F.3d 962, 964–66 (7th Cir.1998) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846–54, 118 S.Ct. 1708, 1717–20, 140 L.Ed.2d 1043 (1998); *Washington v. Glucksberg*, 521 U.S. 702, 719, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997)); *see also Schacht v. Wisconsin Dept. of Corrections*, 175 F.3d 497, 501–02,

(7th Cir.1999). Relying upon *Lewis*, the court in *Dunn* explained that "[t]he touchstone of due process ... is 'protection of the individual against arbitrary action of government,' whether the problem is the denial of fundamental procedural fairness or the exercise of governmental power without any reasonable justification." *Dunn*, 158 F.3d at 965 (quoting *Lewis*, 118 S.Ct. at 1716 (quotation omitted)). The court then stated, "[t]he criteria that govern what is fatally arbitrary in [substantive due process] cases depend upon whether legislation or a specific act of a governmental officer is at issue." *Id.*

When the focus is on the specific act of a governmental official (as opposed to legislation), " 'only the most egregious official conduct' is arbitrary in the constitutional sense." *Id.* (quoting *Lewis*, 118 S.Ct. at 1716). The "benchmark" for a substantive due process violation by a governmental official is "an abuse of power that 'shocks the conscience.' " *Id.* (citing *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)). "Negligent conduct can virtually never meet the constitutional threshold. Instead, ... 'conduct intended to injure in some way unjustifiable by *any* governmental interest' would be most likely to rise to the conscience-shocking level." *Id.* (emphasis in original) (quoting *Lewis*, 118 S.Ct. at 1718). In *Lewis*, the Supreme Court held that the complaint failed to state a substantive due process claim when it alleged that a police officer's reckless behavior during the officer's high-speed pursuit of a

---

regard to the suspension and the expulsion: it would need to infer that the suspension became effective only *after* the Hearing Commission Conference while the expulsion became effective *before* the Hearing Commission Conference. Based upon the evidence before the court, I.U. followed identical procedures with respect to each charge, so it is not reasonable to infer that I.U. differed its procedure in this one area. *See Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 459 (7th Cir.1999) ("[W]hile any inferences drawn from the facts must be viewed in the light most favorable to the non-moving party, only reasonable inferences

need be made.") (citing *Felce v. Fiedler*, 974 F.2d 1484, 1488 (7th Cir.1992)).

19. While it is not entirely clear from the record, the court infers that the Review Board proceeding is not a *de novo* review, but imposes upon the appellant the burden of showing that the Hearing Commission's decision was erroneous. (*See* Weith Aff. No. 2, Ex. F at 2 (discussing Mr. Foo's "burden" of "overturning" the Hearing Commission's decision).) Therefore, the court does not consider the Review Board as presenting another opportunity for any prior procedural inadequacies to be cured.

motorcycle led to the death of the motorcycle's passenger. In *Dunn,* the court affirmed summary judgment in favor of a principal who caused two students to receive a failing grade in band class after the students played unauthorized guitar pieces in a band program. After discussing *Lewis,* the court in *Dunn* noted:

> One is tempted to say that if a police officer's 'precipitate recklessness,' which caused the deprivation of someone's life, was not sufficiently shocking to satisfy substantive due process standards, then it would be nearly absurd to say that a school principal's decision effectively to give two students an 'F' in Band class did.

*Id.*

█ When the focus of a substantive due process case is on legislation (as opposed to a specific act of a governmental official), the court must decide whether the legislation interferes with "certain fundamental rights and liberty interests." *Id.* at 966 (quoting *Glucksberg,* 117 S.Ct. at 2267).[20] In *Glucksberg,* the Court set out two "features" of this analysis:

> First, ... the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. Second, we have required in substantive-due-process cases a careful description of the asserted fundamental liberty interest. Our Nation's history,

legal traditions, and practices thus provide the crucial guideposts for responsible decision making that direct and restrain our exposition of the Due Process Clause.

*Glucksberg,* 117 S.Ct. at 2268 (citations and internal quotations omitted). Under this analysis, the court must " 'carefully formulat[e] the interest' that [Mr. Foo] wants constitutionally protected." *Khan v. Gallitano,* 180 F.3d 829, 833 (7th Cir.1999) (quoting *Glucksberg,* 117 S.Ct. at 2269). Since neither party relies upon *Glucksberg* or its substantive due process analysis in their briefing, they do not provide much assistance in formulating the interest. It is clear, however, that no matter how the interest is formulated, it must involve Mr. Foo's interest in receiving an education. The Supreme Court has already decided that a student's interest in education is not a fundamental right. *See San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *see also Dunn,* 158 F.3d at 966 ("Although students may have some substantive due process rights while they are in school ... education itself is not a fundamental right.") (citations omitted). After noting this, the court in *Dunn* stated, "[t]hat means that [the school's] decision to stack the deck so that these students would fail Band must be sustained unless it is wholly arbitrary." *Id.* This standard "requires an extraordinary departure from established norms." *Id.*

The Defendants move for summary judgment on Mr. Foo's claim that he was

---

20. After *Dunn,* a different Seventh Circuit panel stated, without reference to *Dunn,* that the "*Glucksberg* fundamental rights analysis generally applies in substantive-due-process cases, but for particular circumstances such as the high-speed chase in *Lewis* or pre-trial detention, the specialized analysis adopted for those circumstances would apply." *Khan v. Gallitano,* 180 F.3d 829, 835–36 (7th Cir. 1999). The court in *Khan* applied the *Glucksberg* fundamental rights analysis to a case that did not involve legislation, but involved the allegedly tortious conduct of government officials. However, the court in *Dunn* indicated that the *Glucksberg* fundamental rights analy-

sis applies only when the focus of a substantive due process case is on legislation. To the extent there is any discrepancy between *Khan* and *Dunn* about the scope of the *Glucksberg* fundamental rights analysis, it is irrelevant in this case, because this court analyzes Mr. Foo's substantive due process claim under both the *Lewis* "shocks the conscience" analysis and the *Glucksberg* "fundamental rights" analysis. *Cf. Khan,* 180 F.3d 829, 835–37 (analyzing the case under both the "shocks the conscience" analysis and the "fundamental rights" analysis); *Dunn,* 158 F.3d at 965–66 (same).

denied substantive due process when he was suspended and expelled from I.U.; they contend that the sanctions of suspension and expulsion were rational.[21] Mr. Foo responds only with arguments related to the charge that he violated the behavioral contract, ignoring the summary judgment motion as it relates to his suspension (which was based upon the charge involving the singing incident on the women's floor).[22] Mr. Foo first argues that he was expelled solely because he failed to comply with the behavioral contract (which, he contends, was "built upon ... an unfounded charge"), and then argues that there is no rational relationship between the charge that he did not comply with the behavioral contract and the sanction of expulsion. Mr. Foo is not clear about whether he is charging a substantive due process violation based upon specific act(s) of I.U. officials or legislation (i.e., I.U.'s procedures and rules); therefore, the court will consider his claim from both standpoints.

As an initial matter, the Defendants take issue with Mr. Foo's claim that he was expelled *solely* because he failed to comply with the behavioral contract. It is clear from the Hearing Commission Summary Form that the Hearing Commission relied upon Mr. Foo's overall record of disciplinary misconduct in coming to. its decision to expel Mr. Foo. (Weith Aff. No. 2, Ex. C.) [23] The Code expressly provides that "the imposition of disciplinary sanctions must ... be based upon a consideration of all the circumstances in a particular case, including a student's prior record of misconduct, if any." (Freeman Aff., Ex. A at Part IV, Preamble.) Indeed, even Mr. Foo's counsel argued to the Review Board that "[t]he reading of Mr. Foo's alleged past violations tainted the Hearing Commission's assessment of punishment. As a consequence of Mr. Foo's alleged record being read, Mr. Foo was *again* punished for alleged past violations." (Foo Dep. Ex. 43 at 2 (emphasis in original); *see also* Foo Dep. Ex. 44 at 3 (same argument by Mr. Foo's counsel).)

In support of his argument that he was expelled solely because of his alleged violation of the behavioral contract (rather than

---

**21.** The Defendants do not contest any other element of Mr. Foo's due process claim, such as that the Defendants acted under color of state law.

**22.** The Defendants have shown that summary judgment is appropriate with respect to Mr. Foo's claim that his suspension violated his substantive due process rights. Mr. Foo admitted that he did the conduct that led to the charge: walking unescorted on a women's floor at 4:15 a.m. while intoxicated and loudly singing "Ballad of the Green Berets" and failing to identify himself and otherwise cooperate with a Resident Assistant performing her job. (Foo Dep. at 84–85, 451–53.) Given this admission, there can be no dispute that he violated the Code and Handbook provisions named in his charge letter, including creating a disturbance or distress to others and failing to cooperate with a University official in the performance of her duties. These provisions appear designed to serve legitimate University interests such as protecting the welfare of its student residents and maintaining discipline on University property. Mr. Foo's suspension for this violation neither shocks the conscious nor is wholly arbitrary. *See Dunn,* 158 F.3d at 966 ("[The plaintiffs] freely conceded that they had violated a

school rule, that the rule was designed to preserve discipline in the classroom and to punish student insubordination, and that these were legitimate interests on the part of the school district. That alone is enough to show that their [substantive due process] claim cannot possibly succeed.").

**23.** The Commission's stated rationale for its decision was as follows:

The Commission is deeply troubled by Mr. Foo's five separate violations of Indiana University's *Code of Student Ethics* and *The Handbook for Residence Hall Living.* Especially troubling are the two violations involving alcohol, the more recent of which occurred after Mr. Foo signed the behavioral contract with a residence hall coordinator. Also troubling was Mr. Foo's possession of a large supply of ammunition as detailed in the police reports submitted in regard to the June 12, 1995 incident. The Commission is in agreement that Mr. Foo represents a threat to himself and to the University community. Therefore, it voted unanimously in favor of expulsion from Indiana University.
(Weith Aff. No. 2, Ex. C.)

because of his entire disciplinary record), Mr. Foo cites to: the charge letter and Residence Hall Report Form, indicating that he was being charged with failing to comply with the behavioral contract; and, three notification letters indicating that he was found responsible for the charged conduct and "[b]ased upon [his] involvement in this incident," he is expelled from I.U. (Foo Dep. Exs. 19, 20, 21, 39, 46.)

The issue in the substantive due process analysis is not whether I.U. put Mr. Foo on notice that it was going to rely (or had relied) upon his disciplinary record in devising a sanction; the evidence clearly demonstrates that the decision makers actually did rely upon Mr. Foo's past disciplinary record in making their decision to expel Mr. Foo. Mr. Foo's evidence fails to create an issue of fact as to whether the Hearing Commission relied upon his entire disciplinary record in making a decision as to the sanction: the evidence cited above makes it explicit that the Hearing Commission in fact relied upon Mr. Foo's record (regardless of the incomplete impression arguably given by I.U.'s notification letters to Mr. Foo).[24] (Weith Aff. No. 2, Ex. C; Freeman Aff., Ex. A at Part IV, Preamble; Foo Dep. Exs. 43, 44.)

■ To the extent Mr. Foo claims that his substantive due process rights were violated by the specific acts of I.U. officials, he must show there is a genuine issue of fact as to whether the act of any I.U. official was "an abuse of power that 'shocks the conscience.'" *Dunn*, 158 F.3d at 965 (citation omitted). He has made no such showing. I.U., through its officials,

implemented the behavioral contract as the terms of a disciplinary probation after Mr. Foo's third violation of University regulations in little over a year. Sufficient evidence supported the finding of responsibility for each violation; indeed, Mr. Foo admitted to most of the conduct underlying the charges. In addition to failing to comply with the terms of the contract, itself an infraction, Mr. Foo committed another infraction of University regulations eleven days after signing the contract by causing a disturbance while walking unescorted on a women's floor. No reasonable person could say that it "shocks the conscience" that a university would chose to expel a student who engaged in such a pattern of repeated misconduct.

■ To the extent Mr. Foo claims that his substantive due process rights were violated by the rules and regulations followed by I.U. in his case, he must show there is a genuine issue of fact as to whether those rules and regulations were "wholly arbitrary." *Dunn*, 158 F.3d at 966. Once again, he fails to make such a showing. I.U. had ample evidence showing that Mr. Foo repeatedly violated Code provisions intended to protect the welfare of I.U. students. The punishments for these violations escalated until it reached expulsion. As a matter of law, the final punishment of expulsion for Mr. Foo's fifth offense was rationally related to the legitimate governmental purpose of protecting the welfare of I.U. students.

■ Even if the court accepts Mr. Foo's premise that his expulsion was based

24. The court notes that if the decision made by Mr. Weith and Dean McKaig after the October 30 Judicial Conference constituted the final decision to expel Mr. Foo, then there would be (at least) an issue of fact as to whether the decision makers relied upon Mr. Foo's entire disciplinary record in making the decision to expel Mr. Foo. Mr. Weith is silent on the issue in his Affidavits and the only documentation resulting from the meeting is the November 21 notification letter which states: "Based on your involvement in this incident [failure to comply with the terms of the behavioral contract], I recommended to the Dean of Students, and he has accepted, that you be expelled from the University effective immediately." (Foo Dep. Ex. 39.) However, it is undisputed that the Hearing Commission conducts a *de novo* hearing, and the decision of the Hearing Commission supersedes the "disciplinary sanction(s) initially proposed by the Dean of Students" after the Judicial Conference. (Foo Dep. Ex. 41.) Therefore, once the Hearing Commission makes its decision, the reasons underlying the decision resulting from the Judicial Conference become irrelevant.

solely on the charge that he violated the behavioral contract, the court would come to the same conclusion. The behavioral contract stated the terms of the disciplinary sanction I.U. imposed upon Mr. Foo after the school found him responsible for making threats to the safety of others and threats of suicide. Every document cited by Mr. Foo in opposition to summary judgment on this claim either refers to the contract as a "judicial sanction" or directly refers to the August 30 decision letter (which states that Mr. Foo was found responsible for threatening others and listing the terms of the behavioral contract as his sanction). (Foo Dep. Exs. 19, 20, 21, 39, 46.) Therefore, when considering the charge that Mr. Foo failed to comply with the contract, the court must also consider the reason the contract was imposed in the first place: the fact that Mr. Foo was found responsible for making threats against others and threats of suicide.[25] These threats occurred while Mr. Foo owned a semi-automatic weapon, had stockpiled a large supply of ammunition, and had completed an order form for a "sniper training and employment manual." When asked about the incident, Mr. Foo responded that he had switched doctors and had "issues" with his medication. (McCall Aff. ¶ 14.) The terms of the contract therefore appear to have been designed to eliminate the underlying cause of the incident. When Mr. Foo failed to comply with this sanction by refusing to see his doctor and refusing to regularly take his medication, it was neither shocking to the conscience nor wholly arbitrary for I.U. to expel him. Instead, as a matter of law, the sanction was rationally related to I.U.'s legitimate interest in protecting the welfare of its students. *Cf. Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (holding that two high school student's substantive due process rights were not violated when they were expelled for "spiking" punch with alcohol at an extracurricular school function); *Dunn,* 158 F.3d at 966 ("[The plaintiffs] freely conceded that they had violated a school rule, that the rule was designed to preserve discipline in the classroom and to punish student insubordination, and that these were legitimate interests on the part of the school district. That alone is enough to show that their [substantive due process] claim cannot possibly succeed.").

Mr. Foo relies upon one case in support of his position, *Smith v. School City of Hobart,* 811 F.Supp. 391 (N.D.Ind.1993). In *Smith,* the court considered the constitutionality of a school rule providing for a 4% reduction in grades for each day a

---

**25.** In his argument, Mr. Foo also emphasizes the charge that led to the imposition of the behavioral contract. He contends that the charge was unfounded, citing to his deposition. He testified that at the August 28 Judicial Conference, he told Mr. McCall that, concerning incidents in the police report, "nothing happened. I didn't do anything wrong." (Foo Dep. at 295.) Mr. McCall responded, "even though nothing happened, we still need to make an arrangement." (*Id.* at 296.) Based upon this testimony, Mr. Foo contends that "the underlying 'violation' which gave rise to the behavioral contract in the first place was no violation at all." (Pl.'s Br. Resp. Defs.' Mot. Summ. J. at 13.) However, it is undisputed that Mr. McCall did in fact find that Mr. Foo had made threats to other and himself. Further, there can be no reasonable dispute that the police report contained sufficient support for Mr. McCall to find that Mr. Foo had made threats and was in possession of (off campus property) a sem-iautomatic handgun and (on campus property) three hundred rounds of ammunition. (McCall Aff., Ex. cc.) Mr. McCall's statement that "nothing happened" may be relevant if the issue were whether Mr. Foo was put on notice that Mr. McCall decided that he had made threats. But this is not the issue in substantive, as opposed to procedural, due process analysis. Curiously, Mr. Foo does not use this evidence to support any of his procedural due process arguments. The Court notes however that even if he had used this evidence to support his procedural due process claims, it would not create a genuine issue of material fact. As discussed above, the totality of the circumstances demonstrated that Mr. McCall was charging Mr. Foo with an offense and the behavioral contract was the sanction resulting from that charge. Further, even if there was an issue of fact as to this, the defect was cured by the subsequent process I.U. afforded Mr. Foo.

student has been suspended for alcohol use during school hours. The court held that the rule violated the substantive due process rights of the affected students. The court gave two reasons for its holding: (1) "[t]o warrant an academic sanction, a student's misconduct must be directly related to the student's academic performance, and there is no indication in this record that such is the case"; and, (2) "[t]he rule at hand gives the teacher no discretion in whether to deduct a student's grade for their suspension, which may lead to arbitrary results in practice, that is, disproportionate punishment for an incident." *Id.* at 399 (citation omitted). In contrast to *Smith,* Mr. Foo's expulsion was a completely discretionary decision that did not affect his academic record in any way. Therefore, the case is inapposite.

The court notes that any doubts it may have about the wisdom of I.U.'s actions are not relevant. As the court in *Dunn* noted:

> It may be worth acknowledging that this [affirming the grant of summary judgment on the plaintiff's substantive due process claims] in no way necessarily implies approval of the state official's action; we are certain that no member of the Supreme Court thought in hindsight that the police officer in *Lewis* had responded prudently to the young motorcycle speeders, and we may have similar doubts about the wisdom of the severity of Fairfield's sanctions against the rebel musicians here.

*Dunn,* 158 F.3d at 965; *see also Wood,* 420 U.S. at 326, 95 S.Ct. 992 ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion.... The system of public education that has evolved in this nation relies necessarily on the discretion and judgment

of school administrators...."); *Schacht,* 175 F.3d 497, 504 ("[T]he Due Process Clause does not protect people against ill-considered decisions (which this may or may not have been, of course), any more than it protects the right of students to play whatever music they choose in band.").

## C. Equal Protection Claims

In Count I of the Amended Complaint, Mr. Foo alleges that the Defendants suspended and expelled him because of his race and national origin in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.[26] The Defendants moved for summary judgment, arguing that there is no evidence in the record to support either a *prima facie* case of discrimination[27] or pretext. Mr. Foo does not address these arguments in his response, nor does he designate any evidence relating to the issue of whether any decision was motivated by Mr. Foo's race or national origin, or whether the Defendants' stated reasons for their decisions were pretextual. After examining the evidence designated by both parties, the court finds that there is no evidence to support either a *prima facie* case of discrimination or pretext, and therefore summary judgment will be granted in favor of the Defendants as to the claims in Count I of the Amended Complaint.

## D. Qualified Immunity

■■■■ Finally, the three individual Defendants who have been sued in their individual capacities, Mr. McCall, Mr. Weith, and Dean McKaig, all move for summary judgment on the grounds of qualified immunity. Qualified immunity protects government officials who are performing discretionary functions from liabil-

---

**26.** The court presumes this claim to be brought under the Equal Protection Clause of the Fourteenth Amendment.

**27.** In order to establish a *prima facie* case of discrimination under the Equal Protection Clause, a plaintiff is required to demonstrate that: (1) he is a member of the protected class; (2) he is otherwise similarly situated to members of the unprotected class; (3) he was treated differently from members of the unprotected class; and, (4) the defendants acted with discriminatory intent. *See McNabola v. Chicago Transit Auth.,* 10 F.3d 501, 513 (7th Cir.1993); *see also Johnson v. City of Fort Wayne,* 91 F.3d 922, 944–45 (7th Cir.1996).

ity for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "Whether the State Defendants will be protected by qualified immunity 'turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken.'" *Vickery v. Jones*, 100 F.3d 1334, 1338 (7th Cir.1996) (quoting *Harlow*, 457 U.S. at 819, 102 S.Ct. 2727 and *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). A plaintiff may meet its burden of showing that a legal rule was "clearly established" by pointing to a "closely analogous" case covering both the right at issue and its application to the facts of the case at hand. *See id.* at 1339.

■ The Supreme Court has stated that "[a] necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). This court has previously found that Mr. Foo has not produced sufficient evidence of a constitutional violation to survive summary judgment. Therefore, the court need not proceed further in its qualified immunity analysis. *See, e.g., id.; County of Sacramento v. Lewis*, 523 U.S. 833, 840, 118 S.Ct. 1708, 1714 n.5, 140 L.Ed.2d 1043 (1998). However, even if Mr. Foo had produced sufficient evidence of a constitutional violation on the part of the individual Defendants, the defense of qualified immunity would shield them from liability because Mr. Foo has not met his burden of showing that any legal rule allegedly violated by the individual Defendants was "clearly established."

Mr. Foo points to *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) and *Smith v. School City of Hobart*, 811 F.Supp. 391 (N.D.Ind.1993) as "closely analogous" cases covering his situation. However, as discussed above, the Defendants, as a matter of law, complied with the standards set out in *Goss*. (*See supra*, Part III.A.2.a.) And the court has previously found that *Smith* is not analogous to the facts of this case. (*See supra*, Part III.B.) Furthermore, "district court decisions cannot clearly establish a constitutional right." *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir.1995) (citations omitted). Mr. Foo provides no further support of his claims against the individual Defendants in their individual capacities, and therefore summary judgment is appropriate as to those claims.

## IV. Conclusion

For the foregoing reasons, the court finds that the Defendants' Motion for Summary Judgment should be **GRANTED**.

All of Mr. Foo's claims are terminated by this Entry, so judgment will be entered pursuant to FED.R.CIV.P. 58.